UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JASON GRANT, ALLISON TAGGART, LISA PETERSON, and SAMANTHA LYONS,<br><br>        Plaintiffs,<br><br>        v.<br><br>TRIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS, BEVERLY J. CANNONE, in her official capacity as Justice of the Superior Court, GEOFFREY NOBLE, as Superintendent of the Massachusetts State Police, MICHAEL d'ENTREMONT, in his official capacity as Chief of Police Department of the Town of Dedham, Massachusetts, and MICHAEL W. MORRISEY, in his official Capacity as the Norfolk County District Attorney,<br><br>        Defendants. | Civil Action No. 25-10770-MJJ |

**MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER**

May 28, 2025

JOUN, D.J.

On April 1, 2025, four Massachusetts residents, Jason Grant, Allison Taggart, Lisa Peterson, and Samantha Lyons (collectively, "Plaintiffs") filed suit against defendants Trial Court of the Commonwealth of Massachusetts; Beverly J. Cannone, in her official capacity as Justice of the Superior Court ("Judge Cannone"); Geoffrey Noble, as Superintendent of the Massachusetts State Police; Michael d'Entremont, in his official capacity as Chief of the Police Department of the Town of Dedham, Massachusetts; and Michael W. Morrissey, in his official

1

capacity as the Norfolk County District Attorney (collectively, "Defendants"). [Doc. No. 1]. Plaintiffs challenge buffer zone orders issued by Judge Cannone during the *Commonwealth v. Karen Read*, No. 22-cr-0017 (Mass. Sup. Ct.) trial, alleging that the orders impose unconstitutional prior restraint in violation of the First Amendment and Plaintiffs' due process rights. Plaintiffs further allege that police are enforcing the buffer zone order in an arbitrary and discriminatory manner. Plaintiffs seek a preliminary injunction "enjoining each Defendant from interfering with Plaintiff's right to lawfully engage in constitutionally protected expression and activity." [*Id.* at 11]. For the reasons stated below, Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 2], is DENIED in part and GRANTED in part.

I.   BACKGROUND

A.  The Buffer Zone Orders

Karen Read is charged with the murder of her boyfriend, Boston police officer John O'Keefe. This case has garnered significant media attention and public interest. The trial of the matter first commenced on April 16, 2024, but resulted in a mistrial on July 1, 2024. The retrial began on April 1, 2025, and is presently ongoing.

During the first trial, on April 4, 2024, Judge Cannone issued a buffer zone order (the "2024 Order") which prohibited any individual from "demonstrat[ing] in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of this case." [Doc. No. 1-2 at 3]. The 2024 Order was challenged. The Supreme Judicial Court upheld it, stating that "the trial judge struck a balance between the right to protest or demonstrate and the defendant's right to a fair trial." *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1008 (2024).

Prior to the retrial, on March 25, 2025, Judge Cannone reestablished the buffer zone and entered an order (the "2025 Order") stating that "no individual may demonstrate in any manner, including carrying signs or placards, within 200 feet of the courthouse complex during trial of

this case." [Doc. No. 1-4 at 4]. Additionally, Judge Cannone modified the original 2024 Order to extend the 200-foot buffer zone to include an open space on the western side of the courthouse complex. [*Id.* at 3–4]. On April 1, 2025, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. No. 2], seeking enjoinment of Judge Cannone's 2025 Order. On April 11, 2025, I denied Plaintiffs' Motion, citing *Spicuzza* and finding that Plaintiffs had not demonstrated a likelihood of success on the merits of their claims. [Doc. Nos. 38, 40]. Plaintiffs appealed, and on May 9, 2025, the First Circuit vacated the denial and remanded the case back to this Court. [Doc. No. 52].

### B. The First Circuit Decision and Judge Cannone's Supplemental Order

In its decision, the First Circuit stated that "Plaintiffs have suggested to us that they challenge the [2025] Order as applied to quiet, offsite demonstrations on public property, in areas and at times that do not interfere with trial participants' entrance into and exit from the Courthouse, that do not interfere with the administration of justice, and that will not influence any trial participants in the discharge of their duties." *Grant v. Trial Ct. of Commonwealth of Massachusetts*, No. 25-cv-1380, 2025 WL 1355193 at *3 (1st Cir. May 9, 2025). The First Circuit remanded the "case for further proceedings to determine how the Order has been interpreted and applied and whether the lack of a mens rea requirement renders the [March 25] Order insufficiently tailored." *Id.* at *4. Finally, the First Circuit stated that "the state court could, entirely of its own volition, further simplify any potential First Amendment issues by amending the [2025] Order to introduce a mens rea requirement as in *Cox* and Mass. Gen. Laws ch. 268, § 13A (2025)—i.e., by limiting the [2-25] Order to demonstrations directed toward interfering with the administration of justice or influencing trial participants." *Id*.

Taking that cue, on May 15, 2025, Judge Cannone issued a Supplemental Order Regarding the Buffer Zone (the "Supplemental Order") which referenced the 2025 Order

3

(together, the "Buffer Zone Orders"). *See* [Doc. No. 61-1 at 1–2]. The Supplemental Order states,

> To simplify any potential First Amendment issues related to the Buffer Zone restrictions implemented by prior orders, this court, guided by the Court of Appeal's suggestion set out on page 12 of The Decision, issues the following supplemental order regarding the Buffer Zone:
>
> First, for all the reasons cited in support of prior orders and based upon the parameters of the dispute as narrowed and described in the Decision, all orders of this court remain in place insofar as they apply to Courthouse property.
>
> Second, prior orders remain in place as applied to pathways – including public sidewalks and roads – through which and at which times trial participants enter and exit the Courthouse.
>
> Third, noisy protests, including those using amplified sound, honking horns or loud screaming and yelling that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of his or her duties are prohibited within the buffer zone.
>
> Fourth, the display of written or graphic materials that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of their duties are prohibited within the buffer zone.
>
> Fifth, any person whose activity has been restricted by an officer enforcing this order may request review by a judge of the Superior Court, which request shall be heard as expeditiously as possible.
>
> Quiet, offsite demonstrations on public property, in areas and at times that do not interfere with trial participants' entrance into or exit from the Courthouse, and that do not interfere with the orderly administration of justice, and that are not intended to influence any trial participants in the discharge of their duties are specifically outside the scope of the Buffer Zone restrictions.

[*Id.*]. Plaintiffs challenge the Buffer Zone Orders. At the parties' request, I set an expedited briefing schedule and held a hearing on May 22, 2025.[1] [Doc. No. 71].

---

[1] I acknowledge the amici brief in support of Plaintiffs filed by The First Amendment Lawyers Association, Foundation for Individual Rights and Expression, and National Press Photographers Association. [Doc. No. 73].

### C. Police Enforcement of the Buffer Zone Orders[2]

#### 1. Mr. Michael Bryant and Mr. John Delgado

Michael Bryant is a Host and Executive Producer with Justice Served TV, LLC. [Doc. No. 9-1 at ¶ 2]. On April 1, 2025, Mr. Bryant was "news gathering" inside the buffer zone when he was approached by two unidentified Massachusetts State Police troopers who told him that he could not remain in the area, even though he was not protesting. [*Id.* at ¶¶ 8-9]. While walking, Mr. Bryant saw the Officers approach John Delgado. [*Id.* at ¶ 10]. Mr. Delgado was wearing a blue sticker that says, "Real Justice for John O'Keefe FKR." [*Id.* at ¶ 11]. A trooper told Mr. Delgado, "That's gotta go" in reference to Mr. Delgado's sticker. [*Id.* at ¶ 12]. The trooper then ripped Mr. Delgado's sticker off his jacket and said, "I don't want to see you walking by here again." [*Id.* at ¶¶ 13-14].

#### 2. Mr. Thomas Derosier

On April 1, 2025, Thomas Derosier was confronted by Sergeant Hardman outside of the Norfolk Superior Courthouse and was told that without proper media credentials, he would need to be outside of the buffer zone, or he would be arrested. [25-cv-10812 Doc. No. 1-5 ("Exhibit E, Tom Derosier Video April 1, 2025"); Doc. No. 69-3 at ¶¶ 10]. On May 19, 2025, while Mr. Derosier was filming within the buffer zone in the unloading area for the O'Keefe family, the defense team, and the prosecution, Sergeant Hardman told Mr. Derosier to leave immediately. [Doc. No. 69-3 at ¶¶ 11, 13]. When Mr. Derosier did not comply, he was physically grabbed and dragged out of the buffer zone by Sergeant Hardman, injuring Mr. Derosier's left arm. [*Id.* at ¶ 13].

---

[2] Facts are gleaned from the Complaint, supporting declarations, affidavits, and police reports, as well as the various other related Complaints (25-cv-10812, 25-cv-10818, and 25-cv-11344), and are taken as true for purposes of deciding Plaintiffs' Motion for Preliminary Injunction.

### 3. Ms. Erica Walsh

On Friday, May 9, 2025, Erica Walsh was present within the buffer zone while wearing a sweatshirt that read "Criminals Control Norfolk County." [Doc. No. 56-1 at ¶¶ 2–5]. As Ms. Walsh was leaving a bathroom and heading to her vehicle that was parked within the zone, she was surrounded by three unknown Massachusetts State Police troopers. [*Id. a*t ¶ 6]. The troopers detained Ms. Walsh, saying words to the effect of "You're not going anywhere." [*Id.* at ¶ 7]. At that point, one of the troopers stated, "You're gonna catch a charge," [*Id.* at ¶ 8], indicating he was going to charge Walsh with a criminal offense for wearing the sweatshirt. Ms. Walsh complied and removed the sweatshirt. [*Id*. at ¶ 12]. Underneath the sweatshirt, Walsh was wearing a t-shirt that read "Journalism is not a crime" and "Free Turtleboy" and included the face of Aidan Kearney.[3] [*Id*. at ¶¶ 12-13]. Ms. Walsh had asked a Dedham police officer whether this shirt was permitted within the buffer zone, and the officer replied that he was unsure whether it was. [*Id.* at ¶ 15]. To ensure she could get to her car without being arrested, Ms. Walsh felt she had no choice but to remove her t-shirt and walk through the buffer zone clad only in a brassiere on top. [*Id*. at ¶¶ 15-16].

On Monday, May 12, 2025, Ms. Walsh was again wearing the sweatshirt in the buffer zone when she was confronted by Sergeant Hardman. [*Id.* at ¶ 17]. Sergeant Hardman said words to the effect of "you're causing a …", though he never said what Ms. Walsh was causing, and further stated that Ms. Walsh was "told about this." [*Id.*]. On May 19, 2025, Ms. Walsh was charged with trespass and picketing at Dedham District Court for wearing the same sweatshirt and a hat labeled "FKR," which stands for "Free Karen Read." [Doc. No. 67-3 at 4]. After

---

[3] Mr. Kearney, also known as "Turtleboy," is an online blogger and self-described journalist who was arrested and charged with witness intimidation in connection with the Karen Read trial. [Doc. No. 56-1 at ¶ 13]

initially sitting in front of Norfolk Superior Court (on a cement slab that separates the front lawn of the Registry of Deeds and the sidewalk in front of the courthouse) with her camera crew and her attorney for approximately five minutes, Ms. Walsh (along with her attorney and camera crew) then walked southbound on the sidewalk of High Street, where she was stopped by Sergeant Hardman and Officer Ryan Welsh. [*Id.*]. Sergeant Hardman demanded Ms. Walsh to take off her sweatshirt or be subject to arrest. [*Id.*]. When Ms. Walsh's attorney stated that Ms. Walsh would not answer questions at that time, Sergeant Hardman placed Ms. Walsh under arrest. [*Id.*].

    4. **Mr. Jason Grant**

On or about May 16, 2025, Plaintiff Jason Grant stood across the street from the Norfolk Superior Courthouse while holding an American flag and a sign containing a Bible verse that stated: "2 Corinthians 3:17: Now the Lord is the Spirit, and Where the Spirit of the Lord is, There is Freedom." [Doc. No. 67-1 at ¶¶ 4-5; Doc. No. 68-1 at 3]. Mr. Grant was warned by Massachusetts State Police Sergeant Michael Hardman that signs related to the trial were restricted inside the buffer zone. [Doc. No. 69-3 at ¶ 15]. Sergeant Hardman also informed Mr. Grant that he would "attempt to get better clarity regarding his sign" and consulted Norfolk County First Assistant District Attorney Lisa Beatty, who instructed Sergeant Hardman to allow the sign for the day and noted that the issue would be "revisit[ed]" on the following Monday on May 19, 2025. [*Id*. at ¶¶ 15-16]. Sergeant Hardman then approached Mr. Grant and told him that he could display the sign. [*Id.* at ¶ 16]. Mr. Grant did not display the sign for the rest of the day but displayed it the following Monday, May 19, 2025, while standing in front of the Registry of Deeds. [*Id.*]. At some point, the police did not permit Mr. Grant to stand across the street from the courthouse while holding the American flag and a sign displaying Corinthians 3:17, although

7

it is unclear from the record exactly when Mr. Grant was prohibited from doing so. [Doc. No. 68-1 at 3]. After the Supplemental Order was issued, Mr. Grant was told by Massachusetts State Police that "nothing has changed" regarding the buffer zone. [Doc. No. 67-1 at ¶ 8].

## II.     MOOTNESS

Defendants argue that Plaintiff Grant's claim is moot, because even though he was initially prohibited from protesting, Mr. Grant has since been permitted to protest quietly with his sign. I disagree. "Where during litigation a defendant ceases to engage in challenged conduct and restores the *status quo ante,* the lawsuit may or may not be moot. The Supreme Court has said that such a case is moot only if the defendant meets his 'heavy burden' of persuading the court that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adams v. Bowater Inc.*, 313 F.3d 611, 613 (1st Cir. 2002) (cleaned up). That Mr. Grant, one individual, has been allowed to protest quietly with his one particular sign does not make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. "Unlike in other constitutional contexts, in the speech context, we 'may assume a substantial threat of future enforcement absent compelling contrary evidence.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (2024) (quoting *Barilla v. City of Houston*, 13 F.4th 427, 433 (5th Cir. 2021)). It is undisputed that the high-profile Karen Read trial is ongoing and continues to engender public interest and that individuals like Mr. Grant continue to engage in protected speech activities at or near the courthouse. Furthermore, Defendants dispute that Plaintiffs have shown they are likely to succeed on their claim that the Supplemental Order was unlawfully enforced against protestors. *Adams*, 313 F.3d at 614 (finding that a defendant's unwillingness to admit to unlawfulness of statute was "a predicate point" to determining likelihood of recurrence). Thus, Plaintiff Grant's claim is not moot.

8

### III.    STANDING

To show Article III standing for injunctive relief, the plaintiff must allege a "real and immediate" threat of present or future injury that is not merely "conjectural or hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 108, 103 (1983). Defendants argue that Plaintiffs Taggart, Peterson, and Lyons have not suffered any cognizable harm based on the actions of the Massachusetts State Police. Defendants are correct that no showing has been made that the Buffer Zone Orders were directly applied to Plaintiffs Taggart, Peterson, and Lyons specifically. However, crediting allegations of fear to engage in protesting activities due to the enforcement of the Buffer Zoner Orders, I find that Plaintiffs have shown that they suffered injury in fact due to a chilling effect on their First Amendment speech activities.[4] Specifically, Plaintiffs allege that enforcement of the Buffer Zone Orders has resulted in an ongoing chilling effect on Plaintiffs' protected speech activities within the buffer zone, which "arise[s] from an objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004). Here, Plaintiffs have sufficiently shown that other protestors—including named Plaintiff Grant—have been unlawfully prohibited from speech related activities, resulting in at least one instance of arrest and criminal charges. *See infra* Section IV.2. Therefore, Plaintiffs have standing.

### IV.    PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Gren* 553 U.S. 674, 689 (2008)). Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

---

[4] *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–164 (2014) (citing *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'").

tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. Among these four factors, the likelihood of success is the "main bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (cleaned up).

### A. Likelihood Of Success

I begin with the likelihood of success on the merits, which is considered the most important of the four elements and the "sine qua non" of the calculus. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiffs allege that their First Amendment rights are actively being violated by the Buffer Zone Orders because they are content-based, not narrowly tailored, and constitute a vague unconstitutional regulation. Plaintiffs further argue the Buffer Zone Orders are unconstitutional as applied. In contrast, Defendants argue that the Supplemental Order contains a mens rea requirement as mandated by the First Circuit and that most of the Plaintiffs have not made a showing as to how the buffer zone orders have been applied to them.

#### 1. The Facial Challenge to the Supplemental Buffer Zone Order

##### a. Constitutional Standard[5]

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citing U.S. Const. amend. I). The Supreme Court, however, has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *United States v. Grace*, 461 U.S. 171, 177-78 (1983). "In a traditional or designated public forum, content-neutral

---

[5] As an initial matter, Plaintiffs contend that the Superior Court did not have any authority to enter the Supplemental Order. A court has inherent authority to protect the fairness and integrity of the judicial process and ensuring fair procedure for all parties. This necessarily means guarding against external pressure or influence that poses a danger to the proper administration of justice.

restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and must leave open adequate alternative channels of communication." *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002). If the restriction is not content neutral then it "must satisfy strict scrutiny—that is, it must be the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

### b. Content Based

The parties do not dispute that the speech at issue is protected by the First Amendment and that the location at issue is a traditional or designated public forum. Instead, they dispute whether the Buffer Zone Orders are content neutral.

Here, in relevant part, the Supplemental Order keeps intact the prior order "as applied to pathways – including public sidewalks and roads – through which and at which times participants enter and exit the Courthouse," and bars "noisy protests, including those using amplified sound, honking horns or loud screaming and yelling" and "the display of written or graphic materials *that are intended to interfere with the administration of justice or are intended to influence any judge, juror, witness, or court officer in the discharge of their duties*" within the buffer zone. [Doc. No. 61-1 at 1 (emphasis added)]. Although "[a]ny protest against the defendant, and in support of the Commonwealth, would be equally subject to the restrictions of the buffer zone," *Spicuzza v. Commonwealth*, 494 Mass. 1005, 1008 (2024), the Supplemental Order requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Coakley*, 573 U.S. at 479 (cleaned up). Thus, the Supplemental Order is content based and will only be upheld as constitutional "so long as the state has a compelling interest and the statutes are narrowly tailored to promoting that interest." *O'Neil v. Canton Police Dep't*, 761 F. Supp. 3d 299, 306 (D. Mass. 2024).

11

### c. <u>Narrowly Tailored To Serve A Compelling Government Interest</u>

In remanding, the First Circuit identified that the 2025 Order "lack[ed] a mens rea requirement -- i.e., it likely applies equally to speech directed toward random passersby and speech directed toward trial participants." *Grant*, No. 25-cv-1380, 2025 WL 1355193 at *4. In response, Judge Cannone incorporated a mens rea requirement in her Supplemental Order to ensure Ms. Read receive a fair trial unimpeded from what the Supreme Court has described as "the pressures which picketing near a courthouse may create." *Cox v. State of La.*, 379 U.S. 559, 562 (1965). Specifically, the Supplemental Order applies to certain actions that "*are intended to* interfere with the administration of justice or *are intended* to influence any judge, juror, witness or court officer." [Doc. No. 61-1 at 1 (emphasis added)].

Plaintiffs do not meaningfully contest that there is a compelling state interest.[6] Instead, Plaintiffs advance several arguments that the Buffer Zone Orders are not narrowly tailored.[7] Plaintiffs first challenge the 200-foot zone as too expansive. They next challenge paragraph 4 of the Supplemental Order. I discuss these in turn.

---

[6] "There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create. Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. This Court has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox v. State of La.*, 379 U.S. 559, 562 (1965).

[7] I note that Plaintiffs' representations before me have at times been incongruent with representations made to the First Circuit. For example, Plaintiffs seek to challenge paragraph 2 of the Supplemental Order, which maintains prior orders "as applied to pathways – including sidewalks and roads – through which and at which times trial participants enter and exit the Courthouse" *See* [Doc. No. 61-1 at 1]. However, Plaintiffs stated at oral argument before the First Circuit "that they do not seek to demonstrate along the pathways -- including public sidewalks and roads -- through which trial participants enter and exit the Courthouse." *Grant v. Trial Ct. of Commonwealth of Massachusetts*, No. 25-cv-1380, 2025 WL 1355193 at *2 (1st Cir. May 9, 2025). Plaintiffs also appear to have abandoned their challenge to the Order regarding "noisy protests" as they have represented to the First Circuit that they challenge the buffer zone as applied to "quiet" protests only.

Plaintiffs' first ground for challenge can be addressed briefly. Plaintiffs contest the 200-foot buffer zone, not including courthouse property, but extending to roads and sidewalks through which trial participants enter and exit the courthouse. Plaintiffs also contest the extension of the buffer zone to the west side of the courthouse. In *Cox*, the Supreme Court examined whether the statute was unconstitutionally vague for failure to define the word "near" in relation to a demonstration that took place exactly 101 feet away from the courthouse steps. 379 U.S. at 568. Here, I am not in the best position to determine whether the areas bounded by the Buffer Zone Orders are too expansive. As the First Circuit observed, it is the trial judge who "sees and hears the witnesses at first hand" and who "is in a unique position to evaluate" the procession of the trial. *Chen v. Holder*, 703 F.3d 17, 24 (1st Cir. 2012). Further, the trial judge has "the best coign of vantage" and is "uniquely positioned to weigh the parties' staffing needs, assess the reasonableness of their handling the case, and evaluate the quality and relevance of the services rendered." *Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 298 (1st Cir. 2001). It is the trial judge who is in the best position to make "on-the-spot judgments." *Chen*, 703 F.3d at 24. I, therefore, on the record before me, must defer to Judge Cannone.

Next, Plaintiffs' appear to challenge two separate aspects of paragraph 4 of the Supplemental Order. Turning to the first part of the challenge, regarding the meaning of the phrase "interfere with the administration of justice," [Doc. No. 61-1 at 1], "Black's Law Dictionary defines 'obstructing the administration of justice' and 'interfering with the administration of justice' as '[t]he skewing of the disposition of legal proceedings, as by fabricating or destroying evidence, witness-tampering, or threatening or intimidating a judge.'" *United States v. Seefried*, 639 F. Supp. 3d 8, 11 (D.D.C. 2022 (citing *Perverting the Course of Justice*, Black's Law Dictionary (11th ed. 2019)). This definition suggests a narrower interpretation of the phrase than applicable to the facts in this case. I note however that the

13

verbiage of M.G.L. c. 268 § 13A is nearly identical to the language of the Louisiana statute that was upheld by the Supreme Court.[8] *Cox*, 379 U.S. at 561. On this issue, I am bound by *Cox*.

Plaintiffs' other part of the challenge pertains to the types of people who are protected by the Buffer Zone Orders. Plaintiffs have no quarrel with protecting jurors and witnesses. Indeed, there is a profound interest in protecting the impartiality of both jurors and witnesses. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial jury* of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. Courts must take strong measures to guard the defendant's right to an impartial jury and "ensure that the balance is never weighed against the accused" given "the difficulty of effacing prejudicial publicity from the minds of jurors." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Chandler v. Florida*, 449 U.S. 560, 575 (1981). Regarding witnesses, the Third Circuit has noted that, "disqualification of witnesses [because of exposure to pretrial publicity] may have [the] effect" of preventing trial of a defendant. *U.S. v. Zeiler*, 470 F.2d 717, 719-20 (3rd Cir. 1972). In other words, "[w]itnesses are not so fungible." *Id*. at 720.

Although not explicitly argued, by their inclusion in the record of signs that read, "Bev's Court is a Clownshow" and "Judge Cannone is Corrupt," I surmise that Plaintiffs' quibble is with the inclusion of judges and court officers as classes of individuals also needing protection. And

---

[8] *Compare* M.G.L. c. 268 §13A:
> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty, pickets or parades in or near a building housing a court of the commonwealth . . . shall be punished by a fine of not more than five thousand dollars or by imprisonment for not more than one year, or both.

*with* LSA—Rev.Stat. s 14:401 (Cum.Supp.1962):
> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana * * * shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.

perhaps judges and court officers should not be entitled to the same level of protection as jurors and witnesses. Afterall, they are expected to weather a fair amount of criticism leveled at them. *See Craig v. Harney*, 331 U.S. 367, 376 (1947) ("Judges are supposed to be men [and women] of fortitude, able to thrive in a hardy climate"). In normal circumstances, such criticism would certainly be tolerable under the First Amendment; however, in this present context—a highly charged criminal trial—prohibiting direct attacks pertaining to the credibility and authority of the court and trial judge constitutes permissible restraint. As the Supreme Court recognized, judges and court officers "are human" too and may "be consciously or unconsciously influenced by demonstrations in or near their courtrooms both prior to and at the time of the trial." *Cox*, 379 U.S. at 565. More importantly, jurors may be improperly influenced by such messages.

Recently, another session within this district examined whether M.G.L. c. 268 § 13A was narrowly tailored to serve a compelling government interest. *O'Neil*, 761 F. Supp. 3d at 306-308. In that case, Judge Denise Casper determined that "the statute itself is narrowed by an intent requirement that aligns with the Defendants' compelling interest in protecting the administration of justice." *Id*. at 308. Given that M.G.L. c. 268 § 13A tracks the language of the Louisiana statute which was upheld by the Supreme Court, and the Supplemental Order includes substantially the same mens rea language as M.G.L. c. 268 § 13A, I must conclude that the Supplemental Order is narrowly tailored to serve a compelling government interest.

### d. Substantive Due Process Vagueness

"A statute is impermissibly vague for lack of notice only if it 'prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application.'" *Frese v. Formella*, 53 F.4th 1, 10 (1st Cir. 2022) (cleaned up). I again adopt Judge Casper's reasoning and find that the Supplemental Order is not unconstitutionally vague. *O'Neil*, 761 F. Supp. 3d at 308–309. Here, the Supplemental Order

15

provides clear notice regarding what it means "to interfere with the administration of justice or [to intend] to influence any judge, juror, witness or court officer are prohibited within the buffer zone." [Doc. No. 61-1 at 1]. "[I]t is not the simple act of holding up a sign that is prohibited, but engaging in conduct with the intent of directly or indirectly influencing [a juror or a witness]." *O'Neil*, 761 F. Supp. 3d at 309. A person of average intelligence would not have to guess what it means to interfere with the administration of justice or to intend to influence a judge, juror, witness or court officer. *Frese*, 53 F.4th at 11. Thus, the Supplemental Order is not unconstitutionally vague on its face.

## 2. As Applied Challenge to the Supplemental Buffer Zone Order

Plaintiffs argue that the Massachusetts State Police have been ignoring the Buffer Zone Orders without consequence and are unlawfully prohibiting protestors' speech activities. If the Buffer Zone Orders are narrowly tailored to meet a compelling state interest and is otherwise not unconstitutionally vague on its face, Plaintiff argue, surely the application of the Orders is. On this score, Plaintiffs have a winning argument.

The First Circuit has held that while a "statute was valid on its face, it was still possible that enforcement against a given person in a particular situation could be invalid on an as-applied basis." *McGuire v. Reilly*, 386 F.3d 45, 61 (1st Cir. 2004). Here, although the Buffer Zone Orders are clear, the record shows a persistent pattern of arrests or threats of arrest to protesters and non-protesters alike who are complying with the Buffer Zone Orders. The buffer zone is not a people-free zone. The public has the right of access, not only to the sidewalks and pathways of the courthouse, but access into the courthouse itself. The Buffer Zone Orders may be enforced only against those individuals who engage in activities that are intended to interfere with the administration of justice or are intended to influence trial participants in the discharge of their duties within the buffer zone.

On April 1, 2025, Mr. Bryant was "news gathering" inside the buffer zone when he was approached by two troopers who told him that he could not remain in the area, even though he was not protesting. [*Id.* at ¶¶ 8-9]. Also on April 1, 2025, Sergeant Hardman confronted Mr. Derosier and told him, "You don't have media credentials, you've got to go behind the buffer zone, or you're going to be subject to arrest." [25-cv-10812 Doc. No. 1-5 ("Exhibit E, Tom Derosier Video April 1, 2025"). Neither Mr. Bryant or Mr. Derosier did anything with the intent to influence any judge, juror, witness, or court official or with the intent to interfere with the administration of justice.

After the Supplemental Order was issued, on May 19, 2025, Mr. Derosier was again confronted by Sergeant Hardman, and this time, was physically grabbed and dragged away from the buffer zone for "peacefully filming the courthouse's exterior from across the street." [Doc. No. 68-1 at 4; Doc. No. 69-3 at ¶¶ 11, 13]. Mr. Derosier did not violate the Buffer Zone Orders.

Similarly, Mr. Grant was prohibited from standing across the street from the Norfolk Superior Courthouse with an American flag and "holding a blue sign with a Biblical passage while on the side of the Registry of Deeds Building." [Doc. No. 69-3 at ¶ 15]. Mr. Grant's conduct did not violate the Buffer Zone Orders.

Finally, Ms. Walsh was arrested and criminally charged for wearing a black sweatshirt with the words "Criminals Control Norfolk County" and a hat labeled "FKR" inside the buffer zone. [Doc. No. 67-3 at 4]. Accompanied by a camera crew, Ms. Walsh initially sat on a cement slab that separates the front lawn of the Registry of Deeds and the sidewalk in front of Norfolk Superior Court. [*Id.*]. Subsequently, Ms. Walsh and her camera crew walked southbound on the sidewalk of High Street, where they were met by police. [*Id.*]. Ms. Walsh was then arrested. [*Id.*]. General messages commenting or criticizing "the system" whether that is the courts, the

17

prosecuting agencies, or law enforcement agencies, do not constitute an intent to interfere with the administration of justice or an intent to influence a judge, juror, witness, or court officer. Such messages criticize or call for change without referencing the outcome of the trial. Therefore, the display of "Criminals Control Norfolk County" is constitutionally protected speech.[9] However, the display of "FKR" which is readily understood to mean "Free Karen Read" is not protected in this context. FKR is a direct message about the Defendant's guilt or innocence, impermissibly suggesting to jurors what verdict is expected or appropriate.[10]

Also unprotected, and therefore impermissible, are direct messages that convey threats, fear, or pressure;[11] or implied threats, fear or pressure to conform to public opinion;[12] personal appeals to jurors;[13] legal claims,[14] or statements that directly target trial participants or the integrity of the trial.[15]

---

[9] Other examples of protected speech would include forms of the following: "We demand justice in the courts;" "Fair trials, fair system;" "Accountability of the courts;" and "Reform criminal justice system."

Also permissible are signage or messages that defend a protest's legitimacy without focusing on the trial or its participants. For example, the following would be such protected speech: "The right to protest is sacred;" and "Dissent is patriotic."

[10] Of course, "Convict Karen Read" would also be an impermissible message.

[11] Examples of direct messages that convey threats, fear, or pressure include but are not limited to the following: "Convict or face consequences;" "No justice, no peace – you've been warned;" or "We know where you live."

[12] Examples of implied threats, fear, or pressure to conform to public opinion include but are not limited to the following: "The community is watching;" "Do the right thing;" or "Imagine if defendant/victim were your family."

[13] Examples of personal appeals to jurors include but are not limited to the following: "Jurors, your conscience matters" or "Remember the victim's family."

[14] Examples of legal claims include but are not limited to the following: "The law requires a guilty verdict in this case;" or "Can't convict, no evidence."

[15] Examples of statements that directly target trial participants or the integrity of the trial include but are not limited to the following: "Judge Cannone is corrupt;" or "Bev's Court is a Clownshow."

Taken together, Plaintiffs have shown a likelihood of success on their claim that the Buffer Zone Orders as applied deprived the protestors of their right to conduct constitutionally protected speech activities. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (cleaned up) (As applied and facial challenges should not be treated differently when it comes to "the substantive rule of law necessary to establish a constitutional violation," rather, "classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy.'").

### B. Irreparable Harm

"There is no need for an extensive analysis of [the irreparable harm] element of the preliminary injunction inquiry." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012). Here, Plaintiffs have shown they are likely to succeed in their as applied First Amendment discrimination claim. Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," Plaintiffs have shown they are likely to suffer irreparable harm. *Roman Cath. Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19, (2020) (citing *Elrod v. Burns*, 427 U.S. 347, 373, (1976) (plurality opinion)).

### C. Balance Of The Equities And Public Interest

"A plaintiff seeking a preliminary injunction must establish . . . that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The crux of the balance of equities inquiry is whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc. v. C L Systems, Inc.* 640 F.2d 109, 113 (8th Cir. 1981). "Before issuing a stay, '[i]t is ultimately necessary … to balance the equities—to explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, 580 (2017) (citing *Barnes v. E-Systems, Inc.*

19

*Group Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301, 1305 (1991). A court is not required to grant total relief, "but may mold its decree to meet the exigencies of the particular case." *Id.* When the Government is the opposing party, as here, the balance of the equities and public interest analyses merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, Plaintiffs have shown a "likelihood of success on the merits," which "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Furthermore, "[t]o deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving 'the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.'" *Fortuno*, 699 F.3d at 15 (cleaned up). Where "[t]he only consequence of this injunction will be that [] persons who were unlawfully prevented from engaging in political speech will now be able to engage in such speech," the balance of the equities tips in favor of Plaintiffs and an injunction is in the public interest. *Id*. at 16.

V.      **CONCLUSION**

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, [Doc. No. 2], is <u>DENIED</u> in part and <u>GRANTED</u> in part. Law enforcement officers are enjoined from enforcing the Buffer Zone Orders in ways that are inconsistent with this decision. Prior to enforcement, law enforcement officers must be able to clearly articulate, without speculation, how any individual violated the Buffer Zone Orders, consistent with this decision.

SO ORDERED.

/s/ Myong J. Joun_____
United States District Judge